## Case No. 138.

### The ALBERT.

[Blatchf. Pr. Cas. 280.][1]

District Court, S. D. New York.   Dec. 23, 1862.[2]

PRIZE—BLOCKADE — MUTILATION OF LOG-BOOK — EVIDENCE—VESSEL PURCHASED FROM ENEMY.

1. Invocations of proofs from another case, on the allegation that the consignor and consignee of the cargo were the same in the two cases, and that the shipments had relation to a common commodity and purpose, a bill of lading found on board of one vessel covering cargo on both vessels.

[Cited in The Maria, Case No. 9,073.]

2. False papers as to destination of vessel and cargo.

3. Mutilation and imperfection of log-book.

4. Purchase of vessel from an enemy during the war by a resident in a neutral country with intent to employ her in violating the blockade.

5. Vessel and cargo condemned for an attempt to violate the blockade.

In admiralty. This decree was affirmed by the circuit court. See Blatchf. Pr. Cas. 663, [The Albert, Case No. 139.]

BETTS, District Judge. In this case, heard at the same term and almost simultaneously with that of The Maria, [Case No. 9,073,] the proofs given in the latter suit are invoked by the libellants and made part of the evidence. The vessel and cargo were captured May 1, 1862, at sea, a few miles off Charleston harbor, by the United States gunboat Huron, and were sent to this port for adjudication. The libel, demanding their confiscation as prize of war, was filed May 17, 1862.

On the 10th of June thereafter, the master of the vessel, John F. Stein, intervened, and filed claims and answers to the libel, in behalf of Thomas McWilliam, as owner of the vessel, and of Francisco Otero &

[1][Reported by Samuel Blatchford, Esq.]
[2][Affirmed by circuit court in The Albert, Case No. 139.]

Co. and Rafael L. Sanchez, as owners of different portions of the cargo.

The ship's papers exhibit a British certificate of registry, given at Nassau, April 9, 1862, to Thomas McWilliam, of that port, but a resident of Mantanzas. The vessel was built in New Jersey, and then took the name of Irene. Her crew list bears date April 18, 1862, and is for a voyage from Nassau to New York, without any return port being designated. A clearance of the vessel at Nassau for the port of New York was granted by the receiver general, April 20, 1862. There were on board bills of lading and invoices of portions of the cargo from Nassau and Mantanzas, and a charter-party· between Thomas McWilliam and Francisco Otero & Co., executed in Mantanzas, March 20, 1862, letting the vessel to the latter for the transportation of a cargo to be furnished by the hirers at Mantanzas and Nassau on a voyage to New York.

The suit from which evidence is invoked into this case is that of U. S. v. The Maria, [before cited.] It was instituted May 21, 1862. The vessel was registered at Nassau, April 16, 1862, to William Smith, of Glasgow, Scotland, as having been built in Charleston, South Carolina, and was cleared at Nassau for New York April 16, 1862, and was captured April 30, 1862, by a United States vessel-of-war, near the coast of South Carolina. She had on board an invoice of forty boxes, containing 80 dozen cotton cards, shipped March 28, 1862, by Rafael L. Sanchez, at Mantanzas, to be delivered at New York to Martinez, Gonzales & Co. The said Sanchez, by his claim and answer, filed in that suit July 8, 1862, claimed the merchandise as his property; and it is alleged by the counsel for the libellants that the consignor and consignees in that suit (the Maria and cargo) and the one here on trial (the Albert and cargo) are the same parties, and that the shipments have relation to a common commodity and purpose. On that allegation the evidence in the suit of U. S. v. The Maria was allowed by the court to become, by invocation, evidence in the present suit.

That evidence, so brought into this case, shows that a Mr. Monet, of the firm of Monet, Jemenez & Co., charterers of the schooner Maria, was a passenger on board of that vessel at the time of her capture, and had with him on board a triplicate bill of lading for the cards on the two vessels, in which it was expressed that the cards should be landed in a southern port. It also appears, by comparison of the ship's papers, found on board the two vessels, that the said cards were shipped in both vessels under a common statement in the shipping papers of the destination of the vessels from Mantanzas to New York, and a common letter of instructions by the shipper to the consignees.

This evidence shows satisfactorily, that the shipment of the cards was for some southern port, and that the destination of this vessel, equally with that of her consort, the Maria, was simulated and false in that respect. The bill of lading engaging the delivery of one of the shipments at a southern port was carried covertly on board of the Maria, by one of the carriers of the goods, as his instructions and guide for the delivery of the cotton cards shipped on both vessels. The log of the vessel, found on board, presents a suspicious appearance in several particulars. The whole front part of the book, consisting of many leaves, is cut out and absent. The first entry remaining bears date April 21, 1862, and appears to be the continuation of a preceding statement. The log does not name the time or place of departure, nor the place of destination; but the first entry implies that the vessel was then underway, and ten miles east of the Hole-in-the-Wall. The latitude and longitude are first noted April 23, and the latitude is recorded each· succeeding day in April, but the longitude is not mentioned again. No course or distance run is given in the log. The vessel was captured on the first of May, but no entry is made of the fact. It is manifest that the log was kept with a view ·to conceal the true nature and intention of the voyage; and its gross mutilation amounts, under the rules of the prize law, to an act of culpability, which incurs the penalty of forfeiture of vessel and cargo.

The purchase of the vessel from an enemy by a resident in a neutral country, and the knowledge by the purchaser and the charterers of the existence of the war and of the blockade, and the intention to employ the vessel in violation of the blockade, are condemnatory facts, and, on the proofs before the court, plainly induce the forfeiture of vessel and cargo.

Again, there are in proof cumulative offenses in the conduct of this voyage and of its antecedent either one of which subjects the vessel to confiscation; and the last one is conclusively criminatory of the cargo. The voyage last preceding this one was made in evasion of the blockade of Charleston, and the present voyage was single and entire, from Mantanzas, with the privilege of stopping at Nassau. From the latter port the voyage was directly and palpably for the purpose of violating the blockade of Charleston. All the witnesses concur in statements of the transaction which denote that intent unmistakably.

There is nothing in the case demanding a more detailed exposition of the reasons supporting the decree which· the court feels constrained to pronounce. The adventure is flagrantly one of the many disclosed to the public by the incidents of· this war, in which an exceedingly frail covering is paraded to screen a bold determination and effort to

drive a criminal traffic with the rebels from neutral trading points situated in the vicinity of blockaded ports: That traffic is not diminishing in boldness and perseverance, but, though favored with manifold successes in the aggregate, yet the eyes of the law and justice are not so completely purblind but that many efforts to violate the public law and the rights of the government are frustrated, and result in the discomfiture of pursuits which tend to the great wrong of this country, and to a disrupture of harmony between the United States and their neutral friends. A decree of condemnation and forfeiture of the vessel and cargo will be entered.

This decree was affirmed, on appeal, by the circuit court, November 11, 1863. Blatchf. Pr. Cas. 663, [The Albert, Case No. 139.]